**In re KEY WEST RESTAURANT & LOUNGE, INC., Debtor.**

**KEY WEST RESTAURANT & LOUNGE, INC., Plaintiff,**

**v.**

**CONNECTICUT INDEMNITY COMPANY, et al., Defendants.**

**Bankruptcy No. 84 B 4838. Adv. No. 84 A 728.**

United States Bankruptcy Court, N.D. Illinois, E.D.

Oct. 25, 1985.

Gerard A. Brost, Dept. of Justice, Washington, D.C., for U.S.

R.S. Maione, Law Offices of Drugas, Maione, Morgan & Hyink, Chicago, Ill., for Intern. Meat Co. intervenor.

Neil F. Hartigan, Joel R. Nathan, Atty. General's Office, Revenue Litigation Div., Chicago, Ill., for State of Ill. Dept. of Revenue.

Robert F. Peck, Johnson & Peck, Western Springs, Ill., for Village of Countryside.

Paul J. Richter, William J. Raleigh, DeHaan & Richter, P.C., Chicago, Ill., for Federal Deposit Ins. Corp. as receiver of United Bank of America.

Lawrence M. Cooper, David R. Brown, Cooper & Cooper, Ltd., Chicago, Ill., for Key West Restaurant & Lounge, Inc.

David N. Missner, Steven N. Bazer, Robert P. Handler, Schwartz, Cooper, Kolb & Gaynor Chartered, Chicago, Ill., for Edgewood Bank.

Jerome H. Torshen, Robert J. Slobig, Jerome H. Torshen, Ltd., Chicago, Ill., for Hoffberg Spack & Associates, Inc. (Theodore Spak & Associates, Inc.)

Peter G. Frezados, Regas & Frezados, Chicago, Ill., for Regas & Frezados.

## MEMORANDUM AND ORDER

JACK B. SCHMETTERER, Bankruptcy Judge.

In the fall of 1984, on motion of Court, the parties to this adversary proceeding submitted statements of claim and briefs supporting their respective lien claims. No motion has been filed by any party nor have the parties filed supporting affidavits or a stipulation of facts. However, should the parties to this action file cross motions for summary judgment in accordance with Fed.R.Civ.P. 56(a) [Bankruptcy Rule 7056] accompanied by supporting affidavits or stipulations of fact demonstrating the facts supporting their respective positions and provided no counteraffidavits pose triable issues of fact, this Court shall be prepared to rule and enter judgment in accordance with this Memorandum and Order. Accordingly, the parties to this proceeding shall be given 28 days from the issuance of this Memorandum and Order to file motions for summary judgment with supporting affidavits or stipulations.

*Introduction*

On January 1, 1981, the debtor, Key West Restaurant & Lounge, Inc. ("Key West"), leased the premises at 5917 South LaGrange Road, Countryside, Illinois, ("the premises") from William Bockos and Harry Bockos in order to operate a restaurant. The Bockos acquired the beneficial interest in the premises in 1977 through a financing arrangement with Amalgamated Trust and Savings Bank ("Amalgamated") which holds title to the premises as trustee under trust No. 3347 and held, as mortgagee, the mortgage for the $750,000 purchase price.[1]

On October 1, 1981, defendant Connecticut Indemnity Company ("Connecticut") insured the premises by issuing and endorsing a $2,100,000 special multi-peril policy No. SMP 85-16-83 (SAR). The named insured were Key West, Amalgamated as trustee, and William and Harry Bockos, the trust beneficiaries. Amalgamated as mortgagee was an additional loss payee. On October 26, 1981, fire damaged the premises and Key West terminated its restaurant business.

It appears Connecticut suspected arson, then denied liability for the loss and litigation ensued. On March 15, 1984, the insureds' suit against Connecticut was settled for $285,000 ("Settlement Fund") and a release by Connecticut of all claims arising under the mortgage interest Connecticut acquired as part of a prior settlement with Amalgamated.

On April 13, 1984, International Meat Company filed an involuntary chapter 7 petition against Key West, William Bockos and Harry Bockos. After dismissal of the Bockos from the involuntary case, Key West converted to a voluntary chapter 11 and on May 17, 1984, an order for relief was entered. An examination of the debtor's statement of affairs indicates: the restaurant business has not resumed; unsecured claims total $113,022.69; secured claims total $546,532.00; and, the value of all property owned by the debtor, except a tractor subject to a lien, is $286,100.00. $285,000 of that property is the Settlement Fund.

On June 21, 1984, Key West instituted this adversary proceeding to receive the Settlement Fund and resolve claims asserted against the fund. The Court authorized Key West to receive the Settlement Fund and deposit it in a segregated interest bearing account, dismissed Connecticut as a party defendant, and ordered all claimants to file documentation of their claims and memoranda.

Of the secured claims listed in Key West's statement of affairs, $545,000 are asserted against the insurance Settlement Fund. It has been reported to the Court by Lawrence Cooper, escrowee, that as of April 15, 1985, the Settlement Fund was $296,300.25, this amount must include accrued interest.[2] The claimants against the Settlement Fund are:[3]

| | | |
|---|---|---|
| 1. | Internal Revenue Service (secured taxes) | $115,572.54 [4] |
| 2. | Illinois Department of Revenue (secured taxes) | $ 4,771.20 [4] |
| 3. | Village of Countryside (weed cutting and water service lien) | $ 1,135.00 |

---

**1.** No party has questioned the validity or significance of the financial transactions which resulted in Amalgamated's dual position as land trustee and mortgagee.

**2.** Cooper advised Karen Jackson, Staff Attorney, by letter dated April 23, 1985 that the total sum in his possession as escrowee was $296,300.25. This indicates $11,300.25 in interest has accrued on the $285,000.00 Settlement Fund since September of 1984. Of course, the Court will require a final accounting of interest before distribution of the Settlement Fund is ordered. The letter is attached as Appendix D to this Memorandum and Order.

**3.** The Court notes International Meat Co., Inc., an unsecured creditor, was granted leave to intervene in these proceedings on December 21, 1984. International Meat filed only an answer to the complaint, it has not filed an affidavit or other documentation to support a claim against the Settlement Fund. The Settlement Fund is exhausted by distribution to secured claimants; there is no surplus for distribution to unsecured creditors.

**4.** Amount includes interest calculated through April 13, 1984, the date the involuntary chapter 7 petition was filed against Key West, William Bockos and Harry Bockos.

| 4. | Regas & Frezados (contingent fee) | $127,500.00 |
| 5. | Theodore Spak & Associates (Public Adjustment Fee) | $ 85,000.00 |
| 6. | FDIC as receiver of United Bank of America (collateral assignment) | $ 90,019.61 [4] |
| 7. | Edgewood Bank (collateral assignment) | $100,538.89 [4] |
| | Total | $524,537.24 |

The court notes the additional insured, Amalgamated as trustee and the Bockos, have not presented claims of an interest in the Settlement Fund. Moreover, Amalgamated, as mortgagee, received a $565,000 settlement from Connecticut on October 6, 1982. It has withdrawn its claim of an interest in the fund based upon an assignment of rents and business interruption insurance.

Each creditor asserts a secured interest in the Settlement Fund based upon transactions with or the liability of the debtor, Key West. The factual basis of the creditors' claims and the dates upon which rights arose is set forth in Appendix A hereto which describes with particularity the transactions and occurrences which produced this priority controversy. Appendix B sets forth the order of distribution of the Settlement Fund that this Court concludes (subject to verification in accordance with summary judgment procedure) should be made. Appendix C details the IRS's secured claim for taxes, interest and penalties. These appendices appear at the conclusion of this opinion.

Two claimants, the Village of Countryside and the law firm Regas & Frezados, do not have a secured interest in the Settlement Fund. The court will first indicate why they are not entitled to recover their claims from the Settlement Fund and then address the priority of secured claimants.

### The Village of Countryside

■ The Village of Countryside filed a claim based upon a $1,472.36 lien for water services and then changed the statement to claim $1,135.00 for weed cutting, but did not file documentation of recording liens. There is no indication liens were recorded within 60 days of the weed cutting as required by Ill.Rev.Stat. ch. 24 ¶ 11–20–7. In any event, if the Village's lien is for weed cutting or water services, such liens attach only to the real estate and would not extend to the Settlement Fund. Ill.Rev.Stat. ch. 24 ¶¶ 11–20–7, 11–139–8.

### Regas & Frezados

Regas & Frezados were orally retained the day of the fire to represent the insureds regarding the fire loss. On April 16, 1982, after Connecticut denied liability for the loss, the firm filed suit in the United States District Court on behalf of the insureds. On October 3, 1983, the firm executed a written retention agreement with Key West, William Bockos and Harry Bockos for representation on claims against Connecticut, including prosecution of the suit. A contingent fee was specified:

> The Client agrees to pay to the Attorneys all costs or out-of-pocket expenses incurred in behalf of the Client relating to the aforesaid prosecution of claims in their behalf at their request. Further, the Client agrees to pay to the Attorneys an amount equal to seventeen and a half (17–1/2%) percent of all sums recovered from the Connecticut Indemnity Insurance Company of Hartford, Connecticut, by reason of a trial and judgment awarded therein, or fifteen (15%) percent of any and all sums recovered by reason of settlement, either before or during trial; it being understood that once the trial has been concluded, the Attorneys shall receive seventeen and a half (17–1/2%) percent, even if the cause is subsequently settled.

The total settlement with Connecticut included the $285,000 cash payment and release of the $565,000 mortgage interest acquired from Amalgamated, a total value of $850,000. Regas & Frezados claim a contingent fee equal to 15% or $127,500. They argue their fee is a charge against the Settlement Fund and prior to all claims except that of the public adjuster who is on a parity. Unfortunately for their claims

here they never served notice to perfect a claim of lien under the statute granting liens for attorneys at law. Ill.Rev.Stat. ch. 13 ¶ 14.

■ A lawyer is entitled to compensation for professional services rendered a client. *Greenbaum & Browne Ltd. v. Braun*, 88 Ill.App.3d 210, 213, 43 Ill.Dec. 303, 307, 410 N.E.2d 303, 307 (1st Dist.1980). The written retention agreement executed by the insureds will control the compensation due Regas & Frezados. *Greenbaum & Browne*, 88 Ill.App.3d at 213, 43 Ill.Dec. at 307, 410 N.E.2d at 307. In Illinois a contingent fee agreement, standing alone, is not an assignment to the lawyer of an interest in the litigation. *Anastos v. O'Brien*, 3 Ill.App.3d 1015, 1020, 279 N.E.2d 759, 763 (1st Dist.1972). The general rule is absent a statute or an agreement of the parties a successful litigant may not recover costs or attorney's fees from third parties. *Hamer v. Kirk*, 64 Ill.2d 434, 437, 1 Ill.Dec. 336, 337, 356 N.E.2d 524, 525 (1976); *See also Maynard v. Parker*, 75 Ill.2d 73, 25 Ill.Dec. 642, 387 N.E.2d 298 (1979).

■ The law firm has not indicated in its statement of claim that it perfected an attorney's lien. See Ill.Rev.Stat. ch. 13 ¶ 14. An attorney's lien creates a lien in favor of the lawyer on the proceeds of litigation. It is a means of allowing the lawyer to enforce his right to his fee. *Anastos v. O'Brien*, 3 Ill.App.3d 1013, 1020, 279 N.E.2d 759, 763 (1st Dist.1972) The statute must be strictly followed in order for an attorney to establish his lien and a right of action against the defendant for the enforcement thereof. *Cazalet v. Cazalet*, 322 Ill.App. 105, 107, 54 N.E.2d 61, 63 (3rd Dist.1944). It is the absence of a perfected attorney's lien that prevents Regas & Frezados from recovering their fee from the Settlement Fund. Unfortunately, their rights are limited to recovery upon the personal obligation of their clients to compensate them for the work they have performed.

Regas & Frezados seek priority payment of their $127,500 fee principally on the theory their efforts produced the $285,000 Settlement Fund which may now be distributed to the claimants herein. Allowing such recovery will necessarily reduce distribution to the creditors who are defendants in this proceeding and essentially require they contribute to the payment of Key West's attorney fees. The Illinois courts do not easily allow attorneys to recover their fees from a fund produced by litigation. In *Maynard v. Parker*, 75 Ill.2d 73, 25 Ill.Dec. 642, 387 N.E.2d 298 (1979) the Illinois Supreme Court held a hospital that had a claim and lien against the plaintiff was not required to pay a portion of the plaintiff's attorney's fees out of its portion of the settlement fund. *Maynard v. Parker*, 75 Ill.2d at 74–75, 25 Ill.Dec. at 643–644, 387 N.E.2d at 299–300. The lower court, in reaching the same result, stated the general rule that an attorney's right to recover for professional services must rest on the terms of a contract of employment and cannot be based on a benefit derived by a third party from the services rendered by the attorney. *Maynard v. Parker*, 54 Ill. App.3d 141, 143, 25 Ill.Dec. 642, 644, 369 N.E.2d 352, 354 (3d Dist.1979) *aff'd* 75 Ill.2d 73, 25 Ill.Dec. 642, 387 N.E.2d 298 (1979).

In *Dept. of Public Works v. Exchange Nat'l. Bk.*, 93 Ill.App.3d 390, 417 N.E.2d 1045 (2d Dist.1981) the court stated both statutory and equitable liens exist in Illinois which attorneys may enforce to collect their fees, but found the attorney's statutory lien was unperfected and his contingent fee agreement unenforceable as an equitable lien. *Department of Public Works*, 93 Ill.App.3d at 393–394, 49 Ill.Dec. at 221–222, 417 N.E.2d at 1048–1049; *see also Murukas v. Murkas*, 99 Ill.App.2d 342, 245, 240 N.E.2d 797 (4th Dist.1968). Regas & Frezados having failed to perfect a statutory attorneys' lien attempt to establish an equitable lien upon the Settlement Fund.

In Illinois, whether an attorney's contingent fee agreement creates an equitable lien will turn on the precise language used in the agreement. *McKee-Berger Mansueto, Inc. v. Board of Educ.*, 691 F.2d 828,

836 (7th Cir.1982). To establish an equitable lien the lawyer must establish the existence of an equitable assignment of a portion of the fund by his client. *McKee-Berger,* 691 F.2d at 835–836; *Dept. of Public Works v. Exchange Nat'l Bk.,* 93 Ill. App.3d 390, 394, 49 Ill.Dec. 218, 221, 417 N.E.2d 1045, 1048 (2d Dist.1981).

█ Key West and the Bockos agreed to pay Regas & Frezados "an amount equal to" fifteen percent of all sums recovered from Connecticut. The Illinois courts have specifically held the language "an amount equal to" does not constitute an equitable assignment and will not establish an equitable lien. *Dept. of Public Works v. Exchange Nat'l. Bank,* 93 Ill.App.3d 390, 394, 49 Ill.Dec. 218, 221–222, 417 N.E.2d 1045, 1048–1049 (2d Dist.1981); *see also McKee-Berger Mansueto, Inc. v. Board of Educ.,* 691 F.2d 828, 836 (7th Cir.1982). To recover upon an equitable lien theory the attorney must have used language such as "entitle us to", *McKee-Berger Mansueto, Inc. v. Board of Educ.,* 691 F.2d 828, 837 (7th Cir.1982), or "I hereby assign", *Murukas v. Murukas,* 99 Ill.App.2d 342, 344, 240 N.E.2d 797, 798 (4th Dist.1968). In short, language that creates merely a promise to pay does not establish an equitable lien whereas language that agrees to a portion of recovery going to the attorneys does establish such a lien.

The Illinois courts distinguish between an actual assignment of a portion of the fund and the client's personal promise to pay the lawyer a fee equal to a specified portion of the fund. *McKee-Berger Mansueto, Inc. v. Board of Educ.,* 691 F.2d 828, 836 (7th Cir.1982); *and Dept. of Public Works v. Exchange Nat'l Bank,* 93 Ill.App.3d 390, 394, 49 Ill.Dec. 218, 221–222, 417 N.E.2d 1045, 1048–1049 (2d Dist.1981). Having failed to perfect an attorney's lien, Regas & Frezados is in the same position as the lawyer in *Department of Public Works v. Exchange National Bank,* 93 Ill.App.3d 390, 49 Ill.Dec. 218, 417 N.E.2d 1045 (2d Dist.1981). The firm must now look to its clients to fulfill their personal promise to pay their fee; it simply does not

have a lien on the proceeds of litigation that was successful for the clients.

In *Mills v. Electric Auto-Lite,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), the Supreme Court agreed that representatives of minority shareholders, in establishing a violation of the securities laws, had rendered a substantial service to the corporation and its shareholders and should be reimbursed by the corporation or its survivor for litigation expenses and reasonable attorneys' fees. *Mills,* 396 U.S. at 389, 396, 90 S.Ct. at 624, 627. The Court noted both Congress and the courts have developed exceptions to the general American Rule that attorneys' fees are not ordinarily recoverable as costs. *Mills,* 396 U.S. at 391, 90 S.Ct. at 625. The Illinois Supreme Court has also recognized exceptions to the general rule that the successful party may not recover attorneys' fees where a fund has been brought within the control of the court or substantial benefits have been conferred upon the class of persons represented. *Hammer v. Kirk,* 64 Ill.2d 434, 437, 442, 1 Ill.Dec. 336, 337–338, 340, 356 N.E.2d 524, 525–526, 528 (1976). Regas & Frezados rely upon both the "substantial benefit" and "common fund" exceptions to the American Rule to convince the court their fee is a charge against the Settlement Fund. Examining the underpinnings of both exceptions will indicate that neither applies in this case.

The "substantial benefit" theory and "common fund" doctrine are judicially created exceptions for situations where overriding considerations indicate the need for recovery of attorneys' fees, principally class action and shareholder derivative suits. *Mills v. Electric Auto-Lite,* 396 U.S. 375, 391–392, 90 S.Ct. 616, 625, 24 L.Ed.2d 593 (1970). Both the "substantial benefit" and "common fund" theories are grounded in the primary exception which awards fees "where a plaintiff has successfully maintained a suit, usually on behalf of a class, that benefits a group of others *in the same manner as himself*" *Mills,* 396 U.S. at 392, 90 S.Ct. at 625 (emphasis added).

■ The "substantial benefit" theory reimburses the plaintiff who has conferred "a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter makes possible an award which will operate to spread the costs proportionately among them." *Mills,* 396 U.S. at 393–394, 90 S.Ct. at 626. The purpose furthered by such an award indicates why Regas & Frezados may not recover their fee from Key West's creditors. It "is not to saddle the unsuccessful party with the expenses but to impose them on the class that has benefited from them *and that would have had to pay them had it brought the suit."* *Mills,* 396 U.S. at 396–397, 90 S.Ct. at 627–628 (emphasis added).

Key West did not sue Connecticut as a representative of its creditors. The creditors, except the Internal Revenue Service and Edgewood Bank, had no direct rights against Connecticut and they could not have sued on the policy on their own behalf. Key West sued not to create a fund for the benefit of creditors, but to recover and protect its interest as an insured. The benefit the attorneys conferred upon the creditors was incidental at best since Key West's liability for loans and taxes is not dependent upon the creation of a settlement fund.

In *Mid-West Nat'l Bank of Lake Forest v. Metcoff,* 23 Ill.App.3d 607, 319 N.E.2d 336 (2d Dist.1974), the court rejected the argument that equitable consideration justified an award of fees to attorneys who "only incidentally benefited Mid-West [and] ... primarily sought to preserve their own lien interest." *Midwest Nat'l Bank,* 23 Ill. App.3d at 614, 319 N.E.2d at 342. The court noted the apparent conflict in Illinois as to whether any "equitable principles" allow an award of attorney's fees in the absence of statute or contract, and opined that the contention of such equitable principles is of doubtful validity. *Midwest Nat'l. Bank,* 23 Ill.App.3d at 614, 319 N.E.2d at 342.

Regas & Frezados cannot take advantage of the "substantial benefit" theory or the "common fund" theory used in class actions. Their clients acted in their own interest and are not similarly situated with the creditors the attorneys now seek to describe as a benefited class. There is no overriding or justifiable reason to spread the cost of maintaining this suit among Key West's creditors. Debts and taxes are owed by the successful and unsuccessful plaintiff alike.

■ The Illinois common fund doctrine was first adopted in an insurance subrogation case, *Baier v. State Farm Insurance Co.,* 66 Ill.2d 119, 5 Ill.Dec. 572, 361 N.E.2d 1100 (1977). "This theory of recovery ... is based on the equitable concept that an attorney who performs services in creating a fund should in equity and good conscience be allowed compensation out of the whole fund from all those who seek to benefit from it." *Baier,* 66 Ill.2d at 124, 5 Ill.Dec. 574, 361 N.E.2d at 1102. The Illinois courts, have restricted application of this doctrine to insurance subrogation cases and class action suits. *Powell v. Inghram,* 117 Ill.App.2d 895, 898–899, 73 Ill.Dec. 174, 177, 453 N.E.2d 1163, 1166 (3rd Dist.1983); *see also Insurance Co. of North America v. Norton,* 716 F.2d 1112, 1116–1117 (7th Cir.1983); *and McKee-Berger Mansueto Inc. v. Board of Educ.,* 691 F.2d 828, 835 (7th Cir.1982). It has not been extended to require creditors to bear a proportionate share of the successful plaintiff's attorney fee. *Maynard v. Parker,* 75 Ill.2d 73, 25 Ill.Dec. 642, 387 N.E.2d 298 (1979). Regas & Frezados may not recover based upon the Illinois common fund doctrine.

■ The law firm's argument that Amalgamated must contribute a portion of its $565,000 settlement to pay the attorney's and public adjuster's fees is also without merit. Amalgamated as mortgagee and loss payee had direct and independent rights against Connecticut. It was not a subrogee of the insureds and is not obligated to share the expense of their attorney's fees. *Seventh Avenue Boutique, Inc. v. Aetna Ins. Co.,* 573 F.Supp. 1027, 1028–1029 (N.D.Ill.1983).

### Remaining Secured Claimants

 The remaining claimants hold tax liens or assignments of the insurance policy. State law usually governs conflicts between lienholders competing for the same property. However, when the United States Government is a claimant holding liens for unpaid taxes, federal law controls. *Sgro v. United States*, 609 F.2d 1259, 1260 (7th Cir.1979). The nature of the property to be distributed in this case requires the court to determine the rights of the claimants as they existed under Illinois law before and after the fire.

### The IRS and Illinois Department of Revenue

The IRS assessed $45,083.08 in employment taxes against Key West before the fire. The current liability on these taxes is $69,145.40. On the date of assessment, the amount of the taxes, penalties and interest became liens in favor of the United States "upon all property and rights to property, whether real or personal, belonging to [Key West]" 26 U.S.C. §§ 6321, 6322.

The Illinois Department of Revenue filed two liens for $1322.85 in unpaid taxes before the fire. These liens also arose upon assessment and attached to "all the real and personal property of [Key West]" Ill. Rev.Stat. ch. 120 ¶ 11–1101(a), (c). The Department of Revenue filed its notices of lien before the IRS filed notices of lien for taxes it assessed before the fire. *See* Appendix A.

 The liens for state and federal taxes are both general liens attaching to all the taxpayer's property. This includes Key West's interest in the premises as lessee. The state's general liens, like the federal government's, are choate. The identity of the state as lienor, all the taxpayer's property as subject to the lien, and the amount of the lien, were established by filing the notice of lien. *See United States v. Vermont*, 377 U.S. 351, 84 S.Ct. 1267, 12 L.Ed.2d 370 (1964). The moment the fire occurred, the state and federal tax liens that had previously attached to Key West's leasehold interest automatically attached to

its property right to recover from Connecticut for the fire loss, without further action by the governmental units. *See Phelps v. United States*, 421 U.S. 330, 334–335, 95 S.Ct. 1728, 1731–1732, 44 L.Ed.2d 201 (1975); *See also Texas Oil & Gas Corporation v. United States*, 466 F.2d 1040, 1052 (5th Cir.1972); and *United States v. Colby Academy*, 524 F.Supp. 931, 933 (E.D.N.Y. 1981).

 Although it has been held when state and federal liens attach to property and become choate simultaneously, the federal lien is deemed superior, *Iowa Fair Plan v. United States Internal Revenue Dept.*, 257 N.W.2d 626 (Iowa 1977), it is unnecessary to determine priority between the IRS and Illinois Department of Revenue as to these liens. As a matter of federal and state law, the three assignees of an interest in the policy after the fire occurred took their assignments subject to the general liens for state and federal taxes owed by Key West. *Phelps v. United States*, 421 U.S. 330, 334, 95 S.Ct. 1728, 1731, 44 L.Ed.2d 201 (1979); *Stavros v. Karkomi*, 39 Ill.App.3d 113, 123, 349 N.E.2d 599, 607 (1st Dist.1976). Therefore, they are all subordinate to the claims of the IRS and the Department of Revenue for liens arising before the fire. Since both governmental units are entitled to full payment of liens filed and assessments made before October 26, 1981, there is no conflict between them.

Ten days after the fire, the federal government levied on Connecticut for $47,-065.73 in unpaid taxes that had previously been assessed against Key West. Subsequently, the government filed liens for these amounts. *See* Appendix A. Having determined the federal government is entitled to full payment of taxes assessed before the fire, the liens and assessments subject to levy are to be satisfied from the Settlement Fund.

As noted, there is $296,300.25 to be distributed. Of that amount the IRS will receive $69,145.40 and the Department of Revenue $1322.85 free and clear of the

claims of subordinate assignees. These amounts include interest, and for the IRS penalties, until the the involuntary petition was filed.

### The Tax Claimants and Assignees

There remains $225,832.00 to be distributed and $308,882.49 in post-fire assignments and tax claims, which are as follows: On October 28, 1981, two days after the fire, Theodore Spak & Associates, the public adjuster, took an assignment of 10% of the loss proceeds as his fee, total $85,000. On December 14, 1981, the IRS[5] assessed $18,975.75 in taxes against Key West, current liability $30,365.93. On February 1, 1982, the United of America Bank (now the FDIC as receiver) took an assignment of the policy to secure a $100,000 loan previously extended. Key West, total due $90,-019.61 including interest to the date the involuntary petition was filed. On March 1, 1982, Edgewood Bank took an assignment of the policy to secure $182,469.53 in loans previously extended William and Harry Bockos. The total amount owed by these individuals has been reduced to $100,-000 and is now also secured by a $100,000 certificate of deposit. Current liability with interest to the date the involuntary petition was filed is $100,538.80.[6] On March 8, and March 22, 1982, the IRS assessed $2,671.74 and $8,228.04, respectively, in taxes against Key West, current liability for these taxes $16,061.21. On July 14, and September 8, 1983, the Illinois Department of Revenue filed tax liens for $1244.01 and $2204.34, respectively, total liability $3,448.35.

The court's task is to determine the priority of the state lien claimants against the federal government, and against each other. This task cannot be accomplished with-

out a discussion of what property rights the assignees of the insurance policy acquired under Illinois law. The starting point is not an analysis of whether and when the assignees' liens became "choate". Rather, the issue is what "property and rights to property" belonging to Key West could be subject to federal tax liens under title 26 U.S.C. § 6321.

Federal law does control conflicts between state liens and federal tax liens, but the federal lien attaches only to the taxpayer's "property and rights to property." 26 U.S.C. § 6321. It is the law of the states that create legal interests and rights. *United States v. Ball Construction Co.*, 355 U.S. 587, 593, 78 S.Ct. 442, 445, 2 L.Ed.2d 510 (1958). The relation of state created rights to the laws for for collection of federal taxes is a federal question. However, "the states classification of state created rights must be given weight." *United States v. Ball Construction, Id.* 355 U.S. at 593, 78 S.Ct. at 445. Section 6321 of the Internal Revenue Code creates no property rights but merely attaches federally defined consequences to rights created under state law. *United States v. Bess*, 357 U.S. 51, 55, 78 S.Ct. 1054, 1057, 2 L.Ed.2d 1135 (1958); *Avco Delta Corporation Canada Ltd. v. United States*, 459 F.2d 436, 440 (7th Cir.1972). Therefore "a federal court must look to state law to determine the nature of the legal interest the taxpayer had in property" that the IRS seeks to reach. *Avco Delta Corporation Canada Ltd. v. United States*, 459 F.2d 436, 440 (7th Cir.1972); *citing Aquillino v. United States*, 363 U.S. 509, 512–513, 80 S.Ct. 1277, 1279–1280, 4 L.Ed.2d 1365 (1960). As far as the proceeds of the insurance policy are concerned, the rights of the IRS rise no higher than those of the tax-

5. After the fire the IRS also filed liens for prior assessments. The dates notices of liens were filed for assessments made before and after the fire appear in Appendix A.

6. Robert P. Handler of Schwartz, Cooper, Kolb & Gaynor, counsel for Edgewood Bank, advised the Court by letter dated April 11, 1985, that as of May 17, 1984 Harry Bockos, William Bockos and Nick Bahramis owed Edgewood Bank prin-

cipal of $150,000 plus accrued interest of $2,991.78. On December 20, 1984, all accrued interest was paid and a $50,000 reduction in principal made. Handler also advised that the bank had obtained a certificate of deposit in the amount of $100,000 pledged by the aforementioned individuals. The letter is attached as Appendix E to the Memorandum and Order.

payer, Key West. *Avco Delta,* 459 F.2d at 441. And the Illinois Department of Revenue is, of course, similarly situated.

The Illinois Supreme Court has cautioned in cases concerning the pledge of an insurance policy, "we must not permit ourselves to confuse the contract of insurance itself, with the policy, which is mere written evidence of that contract." *Immel v. Travelers Insurance Co.,* 373 Ill. 256, 260, 26 N.E.2d 114, 116 (1940). For "[i]t is quite true ... that there is a difference between an assignment and a pledge." *Immel,* 373 Ill. at 260, 26 N.E.2d at 116.

The contract of insurance was between Connecticut and the policy holders, Key West, Amalgamated as trustee, and the trust beneficiaries. All claimants, including the taxing authorities, derive their interests as secured creditors through Key West as an insured. Save for the United States which levied, as to the Settlement Fund, the creditors have no direct rights against Connecticut. It cannot be disputed that each assignee received an assignment of a portion of the *contract of insurance* to secure a past debt or present obligation. However, none took physical possession of the policy, had its interest endorsed thereon, or recorded the assignment. Thus, the assignees are what is often called "secret lienors". They are, however, protected by the common law of Illinois.

Each assignee took its assignment from Key West after the loss occurred. Therefore, the assignments are valid in Illinois, notwithstanding the assignees did not have an insurable interest. *Lain v. Metropolitan Life Ins. Co.,* 388 Ill. 576, 578, 58 N.E.2d 587, 588 (1944); *Brown v. State Farm & Casualty Corp.,* 33 Ill.App.3d 889, 893, 338 N.E.2d 427, 430 (3d Dist.1975). Since they acquired their interests after the fire, each assignee received a portion of an assignable cause in action. That is, each received an interest in Key West's right, dependent upon an express contract, to recover money or damages from Connecticut by action. *See Lain v. Metropolitan Life Ins. Co.,* 388 Ill. 576, 578, 58 N.E.2d 587, 588 (1944).

The assignments in this case, like the assignment of a passbook savings account in *Iser Electric Co. v. Ingran Constr. Co.,* 48 Ill.App.3d 110, 6 Ill.Dec. 136, 362 N.E.2d 771 (2d Dist.1977), are governed by principles of common law. *Iser,* 48 Ill.App.3d at 120, 6 Ill.Dec. at 142, 362 N.E.2d at 779. There is no supplemental body of statutory law which gives the assignees additional rights against Key West or its other creditors.

An insurance policy is not a negotiable instrument since it does not contain an unconditional promise to pay a sum certain in money. Therefore, a transfer of the policy is not governed by Article 3 of the Uniform Commercial Code. 26 Ill.Rev. Stat. § 3–104; *and Immel v. Travelers Insurance Co.,* 373 Ill. 256, 260, 26 N.E.2d 114, 116 (1940). Article 9 specifically excludes the transfer of an interest in an insurance policy, except as § 9–306 proceeds. 26 Ill.Rev.Stat. § 9–104(g). Therefore, the assignee who takes an interest in a claim under an insurance policy does not receive the statutory rights of a secured creditor protected by Article 9. Each assignee must stand on his own contractual rights. *Immel v. Travelers Insurance Co.,* 373 Ill. 256, 262, 26 N.E.2d 114, 117 (1940).

In each case, the delivery of an interest in Key West's insurance policy with Connecticut by written assignment constituted a common law pledge and created a lien in favor of the assignee. *Immel,* 373 Ill. at 260–261; 26 N.E.2d at 116–117. The assignment was an essential part of each pledge. *Immel,* 373 Ill. at 260–261, 26 N.E.2d at 116–117. *See also Arco Pet. Prod. Co., Etc. v. R & D Auto, Inc.,* 118 Ill.App.3d 634, 74 Ill.Dec. 197, 455 N.E.2d 227, 230 (1st Dist.1983). Key West's claim against Connecticut could only be delivered by assignment. *Immel v. Travelers Insurance Co.,* 373 Ill. 256, 260–261, 26 N.E.2d 114, 116 (1940).

Key West's assignment of the insurance contract is governed by the same law governing assignment of contracts

generally. *In re Estate of Cohen*, 23 Ill. App.2d 411, 417, 163 N.E.2d 533, 536 (1st Dist.1960). Each assignment was a transfer of an identifiable claim or right from Key West to the assignee. *Litwin v. Timbercrest Estates*, 37 Ill.App.3d 956, 958, 347 N.E.2d 378, 379 (1st Dist.1976); *See also Iser Electric Co. v. Ingran Constr. Co.*, 48 Ill.App.3d 110, 115, 6 Ill.Dec. 136, 140, 362 N.E.2d 771, 775 (2d Dist.1977), *quoting Anderson v. McGraw*, 124 Ill.App. 457, 458–459 (1906). In Illinois such assignments are recognized as the conveyance of a property right from the assignor to the assignee. The secured assignee receives a property interest that is superior to a judgment lien creditor's provided the assignee gives notice of his assignment during the progress of the suit and before judgment. Ill.Rev.Stat. ch. 110 ¶¶ 2–1402(e), 12–710; *and Iser Electric Co. v. Ingran Constr. Co.*, 48 Ill.App.3d 110, 113–120, 6 Ill.Dec. 136, 141–144, 362 N.E.2d 771, 776–779 (2d Dist.1977); *see also Glover v. Lee*, 140 Ill. 102, 29 N.E. 680 (1892) and *National Bank of Albany Park v. Newberg*, 7 Ill.App.3d 859, 865, 289 N.E.2d 197, 201–202 (1st Dist. 1972).

 There is much dispute among the parties, concerning the validity of assignments that secure prior debts or were not acknowledged by Connecticut. But each assignment of insurance proceeds involved here was valid at common law. Both the FDIC and Edgewood Bank hold assignments as security for loans extended prior to the date of assignment. Edgewood's assignment secures the personal liability of William and Harry Bockos. The banks are not protected by provisions of the tax laws protecting purchasers and creditors from unrecorded federal and state tax liens since they did not give valuable consideration at the time of assignment. See 26 U.S.C. § 6323(a), (b), (h)(1), (6); *and* Ill.Rev.Stat. ch 120 ¶ 11–1103. Yet the assignments themselves are valid. A pre-existing debt is valid consideration for the assignment of a cause in action. *Glover v. Lee*, 140 Ill. 102, 29 N.E. 680 (1892); *Iser Electric Co. v. Ingran Constr. Co.*, 48 Ill.App.3d 110, 117–118, 6 Ill.Dec. 136, 141–142, 362 N.E.2d

771, 776–777 (2d Dist.1977), *citing William v. West Chicago Street R.R. Co.* 199 Ill. 57, 64 N.E. 1024 (1902). The general rule in Illinois is that, absent fraud, the assignee of an asset prevails over the subsequent creditor of the assignor. *Iser Electric Co. v. Ingran Constr. Co.*, 48 Ill.App.3d 110, 117–118, 6 Ill.Dec. 136, 141–143, 362 N.E.2d 771, 776–778 (2d Dist.1977). No claimant contends the banks' assignments were fraudulently procured.

 Since the assignees do not seek recovery from Connecticut, it is immaterial that Connecticut acknowledged one assignment and not another. The insurer's conditions on assignment only apply to assignments before loss. *Lain v. Metropolitan Life Ins. Co.*, 388 Ill. 576, 578, 58 N.E.2d 587, 588 (1944). The provisions of a policy restricting assignments are for the benefit of the insurer. They do not affect the validity of the assignee's contract as against his assignor. *Gray v. Penn Mutual Life Ins. Co.*, 5 Ill.App.2d 541, 550, 126 N.E.2d 409, 414 (1st Dist.1955).

 In short, each assignment was valid. The assignees are secured creditors holding liens. *Immel v. Travelers Insurance Co.*, 373 Ill. 256, 260–261, 26 N.E.2d 114, 116 (1940); *Iser Electric Co. v. Ingran Constr. Co.*, 48 Ill.App.3d 110, 119, 6 Ill. Dec. 136, 143, 362 N.E.2d 771, 778 (2d Dist.1977). The common law of Illinois renders a pledge by assignment more than a charge or lien against the property; it is rather a conveyance of the asset to the creditor to be retained as security. *See Immel v. Travelers Insurance Co.* 373 Ill. 256, 260–261; 26 N.E.2d 114, 116 (1940); *and Litwin v. Timbercrest Estates*, 37 Ill. App.3d 956, 958, 347 N.E.2d 378, 379–380 (1st Dist.1976). At common law, absent fraud, a previous legal or equitable assignment will be protected against subsequent creditors of the assignor. *Iser Electric Co. v. Ingran Constr. Co.*, 48 Ill.App.3d 110, 116, 118, 6 Ill.Dec. 136, 143–144, 362 N.E.2d 771, 778–779 (2d Dist.1977). Therefore tax assessments and liens after the fire attached only to Key West's "property

and rights to property" which had not been previously conveyed to an assignee.

■ By the terms of the assignments, the priority among assignees is first in time, first in right. Therefore, Theodore Spak & Associates is next entitled to receive $85,000 or 10% of the loss proceeds assigned to him as security. It is therefore unnecessary to determine whether Spak is entitled to payment as the holder of an equitable lien or an administrative expense.

The IRS is next entitled to $30,365.93 for its December 14, 1981, assessment. This assessment is subordinate to Spak's assignment and prior to that of the two banks. Notice of the IRS lien was recorded before the Department of Revenue recorded its liens in 1983.

After paying those two claims, there would remain $110,466.07 to be allocated between the two banks and the tax claimants for their further claims.

The FDIC's assignment is prior to Edgewood Bank's. It is also prior to subsequent assessments and liens made or filed by the IRS and the Department of Revenue. It will receive $90,019.61.

■ There remains $20,446.46 to be distributed amongst Edgewood Bank and the taxing authorities. Edgewood Bank is the prior assignee. It did receive its assignment to secure the personal obligations of William Bockos, Harry Bockos and Nick Bahramis. In addition, in December of 1984, it reduced the amount owed by the Bockos to $100,000 and received from them a $100,000 certificate of deposit as collateral.[7] However, no party has suggested the assignment to Edgewood Bank was a fraudulent one. Absent fraud an assignee prevails over subsequent creditors of his assignor. *Iser Electric Co. v. Ingran Constr. Co.*, 48 Ill.App.3d 110, 117–118, 6 Ill.Dec. 136, 141–143, 362 N.E.2d 771, 776–778 (2d Dist.1977).

■ It has not been suggested that the court should marshall assets to require Edgewood Bank first to seek satisfaction from the $100,000 certificate of deposit. If such had been suggested, it could not be done. The requirement for such procedure is that there be two funds in the hands of a debtor common to the competing creditors. That requirement is lacking in this case. *DuPage Lumber & Home Imp. v. Georgia-Pacific Corp.* 34 B.R. 737, 740 (N.D.Ill. 1983); *Farmers & Merchant Bank v. Gibson,* 7 B.R. 437, 439 (Bankr.N.D.Fla.1980).

Therefore, Edgewood Bank is prior to subsequent assessments and liens made and filed by the IRS and the Department of Revenue. Edgewood Bank will receive the balance of $20,446.46. Interest accuring on the Settlement Fund after April 15, 1985 will be distributed to Edgewood Bank to the extent of its remaining claim, $80,-092.43.

The indicated order of distribution of the Settlement Fund, subject to what appears on cross motions for summary judgment, appears at the conclusion of this opinion as Appendix B.

## APPENDIX A*

| Date | Occurrence | Amount |
|------|-----------|--------|
| Nov. 4, 1977 | Amalgamated Trust & Sav. Bank as mortgagee records trust deed and assignment of rents on premises 5917 S. LaGrange, Countryside, IL owned by Amalgamated as trustee under trust #3347. William Bockos and Harry Bockos sole beneficiaries of trust. | $750,000 purchase price financed |
| Jan. 1, 1981 | William Bockos and Harry Bockos as beneficiaries of trust #3347 lease premises 5917 S. LaGrange to Key West Restaurant & Lounge, Inc. | |
| Mar. 30, 1981 | IRS assesses 941 taxes against Key West. Levy served 11–6–81. Lien filed 4–16–82. | $1,379.73 |

7. *See* note 6 *supra.*

| Date | Occurrence | Amount |
|------|-----------|--------|
| Apr. 23, 1981 | IRS assesses 940 taxes against Key West. Lien filed 4–5–83. | $469.63 |
| May 25, 1981 | IRS assesses 940, 941 taxes against Key West. Levy served 11–6–81. Lien filed 4–16–82. | $2,342.70 |
| June 19, 1981 | Ill. Dept. of Rev. files tax lien against Key West. 4th Qtr. 1979 assessment. | $82.16 |
| Aug. 10, 1981 | IRS assesses 941 taxes against Key West. Levy served 11–6–81. Lien filed 4–16–82. | $20,333.54 |
| Oct. 1, 1981 | Connecticut Indemnity Company endorses Special Multi-Peril policy SMP–85–16–83 (SAR) insuring premises 5917 S. LaGrange. Insured: Key West, Amalgamated a/t/u/t #3347 and trust beneficiaries. | $1,600,000 Building $550,000 Personal Property |
| Oct. 7, 1981 | Ill. Dept. of Rev. files tax lien against Key West. 4th Qtr. 1980 assessment. | $1,240.69 |
| Oct. 12, 1981 | IRS assesses 941 taxes against Key West. Levy served 11–6–81. Lien filed 12–10–81. | $20,557.48 |
| Oct. 26, 1981 | Fire at premises 5917 S. LaGrange. Key West orally retains law firm Regas & Frezados regarding fire loss. | |
| Oct. 28, 1981 | Key West, Amalgamated a/t/u/t #3347 and trust beneficiaries retain Hoffberg, Spak & Assoc., public adjusters, for 10% of adjusted claim and assign loss proceeds as security. | $85,000 (10% of settlement) |
| Nov. 6, 1981 | IRS serves levy on Connecticut for 940, 941 taxes assessed against Key West on March 30, April 23, May 25 and Aug. 10, 1981. Liens filed 12–10–81 and 4–16–82. | $47,065.73 |
| Dec. 10, 1981 | IRS files lien against Key West. 941 taxes assessed 10–12–81. Subject of 11–6–81 levy. | $20,557.48 |
| Dec. 14, 1981 | IRS assesses 941 taxes against Key West. Lien filed 2–18–82. | $18,975.75 |
| Jan. 21, 1982 | Hoffberg, Spak & Assoc. submit proof of loss and claims for loss to Connecticut for fire damage to premises 5917 S. LaGrange. | $1,567,145.37 ** |
| Feb. 1, 1982 | FDIC, receiver for United of America Bank: Key West assigns UAB its interest in Connecticut policy SMP 85–16–83 (SAR) as security for $100,000 note executed by Key West on 7–24–80. | $90,019.61 plus interest |
| Feb. 18, 1982 | IRS files lien against Key West. 941 taxes assessed 12–14–81. | $18,975.75 |
| March 1, 1982 | Edgewood Bank: Key West assigns its interest in Connecticut policy SMP 85–16–83 (SAR) to Edgewood to secure $182,469.53 in loans previously extended Bill Bockos and Harry Bockos. | $100,000 plus $538.84 interest owing as of Dec. 1984 |
| March 8, 1982 | IRS assesses 941 taxes against Key West. Lien filed 4–5–83. | $2,671.74 |
| March 22, 1982 | IRS assesses 941 taxes against Key West. Lien filed 1–24–83. | $8,228.04 |

| Date | Occurrence | Amount |
|---|---|---|
| April 16, 1982 | IRS files lien against Key West. 940, 941 taxes assessed March 30, May 25 and August 10, 1981. Subject of 11–6–81 levy. | $24,055.97 |
| April 16, 1982 | Regas & Frezados file complaint against Connecticut in federal district court on behalf of Key West, Amalgamated a/t/u/t #3347 and trust beneficiaries for failure to pay amount of fire loss payable under policy SMP 85–16–83 (SAR). | $1,567,145.37 prayer for damages |
| May 2, 1982 | Connecticut notifies Edgewood Bank it has denied Key West's claim for fire loss, therefore, Edgewood is not entitled to proceeds of policy SMP 85–16–83 (SAR) and acknowledges Edgewood's assignment from Key West as prospective only. | |
| Oct. 6, 1982 | Amalgamated Trust & Sav. Bank releases Connecticut from any liability to Amalgamated as insured mortgagee under policy SMP 85–16–83 (SAR) for $500,000 plus delinquent real estate taxes and to that extent assigns its note and mortgage to Connecticut. This settled Amalgamated's claim as additional loss payee and subrogated Connecticut to Amalgamated rights against the premises and, if any, the trust beneficiaries. | $565,000 (settlement) |
| Jan. 24, 1983 | IRS files lien against Key West. 941 taxes assessed 3–22–82. | $8,228.04 |
| April 5, 1983 | IRS files lien against Key West. 940, 941 taxes assessed 4–23–81 and 3–8–82. | $3,141.37 |
| July 14, 1983 | Ill. Dept. of Rev. files lien against Key West. 2nd Qtr. 1981 assessment. | $1,224.01 |
| Sept. 8, 1983 | Ill. Dept. of Rev. files liens against Key West. 3rd and 4th Qtr. 1981 assessments. | $2,204.35 |
| Oct. 3, 1983 | Law firm Regas & Frezados receives written retention agreement from Key West, Bill Bockos and Harry Bockos for representation on claims against Connecticut. Representation includes prosecution of *Key West v. Connecticut Indemnity Co.*, filed on April 16, 1982, and a contingent fee equal to expenses plus percentage of recovery from Connecticut. | $127,500.00 (15% of settlement) |
| March 15, 1984 | *Key West v. Connecticut*, settled. Mutual release executed. Connecticut agrees to pay $285,000 in satisfaction of all claims relating to policy SMP 85–16–83 (SAR) and release all claims arising under the mortgage interest it acquired from Amalgamated. Case No. 82 C 2367 dismissed effective 2–21–84. | |
| April 13, 1984 | Involuntary Chapter 7 petition filed against Key West, Bill Bockos and Harry Bockos by International Meat Co. | |
| May 8, 1984 | Bill Bockos and Harry Bockos dismissed from involuntary case. | |
| May 17, 1984 | Order for relief, Key West converts to voluntary Chapter 11. | |

| Date | Occurrence | Amount |
|---|---|---|
| June 21, 1984. | Key West files adversary No. 84 A 728 to receive $285,000 settlement fund and resolve claims against the fund. | |
| Sept. 18, 1984 | Connecticut tenders $285,000 to Key West, as authorized, for deposit in segregated interest-bearing account to be disbursed to claimants pursuant to court order. Connecticut dismissed from 84 A 728. | |
| Oct. 22, 1984 | Parties with interest in $285,000 settlement fund ordered to submit claims, supporting documentation, objections and memoranda. | |

\* The Village of Countryside, unperfected and unsecured, has been omitted from this Appendix.

\*\* This amount is derived from the complaint filed by Regas & Frezados on 4–16–82.

## APPENDIX B

Distribution to Secured Claimants

| Claimant | Amount |
|---|---|
| 1. Internal Revenue Service [1] | |
| a. Assessments to Oct. 26, 1981 | $ 69,145.40 |
| b. Dec. 14, 1981 assessment | $ 30,365.93 |
| Total | $ 99,511.33 |
| 2. Illinois Dept. of Revenue [2] liens filed to Oct. 26, 1981 | $ 1322.85 |
| Total | $ 1322.85 |
| 3. Theodore Spak & Associates public adjustment fee—10% loss proceeds on policy SMP 85–16–83 (SAR) | $ 85,000 |
| Total | $ 85,000 |
| 4. FDIC as receiver United of America Bank [1] collateral assignment of policy No. SMP 85–16–83 (SAR) | $ 90,019.61 |
| Total | $ 90,019.61 |
| 5. Edgewood Bank [1, 3] collateral assignment of policy No. SMP 85–16–83 (balance of fund) | $ 20,446.46 |
| Total | $ 20,446.46 |
| Total Distributed Hereunder | $296,300.25 |
| Total Fund as of April 15, 1985 | $296,300.25 |
| | 0.00 |

## APPENDIX C

Current IRS claims

Part A—Assessments before October 26, 1981

| Assessment Date & Amount | Current Liability [1] | |
|---|---|---|
| 1. March 30, 1981 $1,379.73 | $ 90.87 | interest |
| | $ 90.87 | |
| 2. April 23, 1981[2] $469.63 | $ 380.85 | tax |
| | 95.21 | penalty |
| | 323.91 | interest |
| | $ 799.97 | |
| 3. May 25, 1981 $2,342.70 | $ 259.39 | penalty |
| | 139.64 | interest |
| | $ 399.03 | |
| 4. August 10, 1981 $20,333.54 | $ 18,425.83 | tax |
| | 4,247.94 | penalty |
| | 11,468.15 | interest |
| | $ 34,141.92 | |
| 5. October 12, 1981 $20,557.48 | $ 18,895.75 | tax |
| | 4,062.59 | penalty |
| | 10,755.27 | interest |
| | $ 33,713.61 | |
| Total | $ 69,145.40 | |

**1** Amount includes interest to April 13, 1984, date involuntary petition was filed.

**2** Includes amounts set forth in notices of lien which vary from the Department's statement of claim.

**3** Edgewood Bank will additionally receive all interest accruing after April 15, 1985 to the extent of $80,092.43.

**1** All amounts are taken from the proof of claim filed by the IRS on July 10, 1984. All interest and penalties are to date the involuntary petition was filed.

**2** The proof of claim indicates a 4–23–82 assessment date but the notice of lien and IRS objection to claims indicate a 4–23–81 assessment date.

Part B—Assessments After the Fire

| Assessment Date & Amount | Current Liability | |
|---|---|---|
| 1. December 14, 1981<br>$18,975.75 | $ 17,660.64 | tax |
| | 3,542.13 | penalty |
| | 9,163.16 | interest |
| | $ 30,365.93 | |
| Total[3] | $ 30,365.93 | |
| 2. March 8, 1982<br>$2,671.74 | $ 2,474.47 | tax |
| | 457.77 | penalty |
| | 1,163.11 | interest |
| | $ 4,095.35 | |
| 3. March 22, 1982<br>$8,228.04 | $ 7,230.06 | tax |
| | 1,337.41 | penalty |
| | 3,398.39 | interest |
| | $ 11,965.86 | |
| Total[4] | $ 16,061.21 | |
| Total Liability | $115,572.54 | |

---

[3] This amount is subordinate to Theodore Spak & Associates and prior to the bank assignees and the Illinois Dept. of Revenue.

[4] This amount is subordinate to the bank assignees and is the only amount not paid.

## APPENDIX D

### LAW OFFICES

## COOPER & COOPER, LTD.

A PROFESSIONAL CORPORATION
SUITE 1690
55 WEST MONROE STREET
CHICAGO, ILLINOIS 60603
(312) 372–0650

HARRY A. COOPER
LAWRENCE M. COOPER
BARNEY R. COOPER
(DECEASED)

———

DAVID R. BROWN
DEBBIE K. EBNER
W. ELLIOTT DUNN
DAVID SOKOLOW

BETSY J. WOLF
THOMAS M. CANNON
ANDREW J. ARKIN

Delivered by Messenger

April 23, 1985

Office of the Honorable John Schwartz
219 S. Dearborn St.
Chicago, IL. 60604

Attn: Karen Jackson

Re: Key West Restaurant &
Lounge, Inc.

Dear Ms. Jackson:

Please note that as of April 15, 1985 we hold in our possession, as escrowees, the total sum of $296,300.25.

Yours truly,
/s/ Lawrence M. Cooper
Lawrence M. Cooper

LMC/jw

## APPENDIX E

### LAW OFFICES

## SCHWARTZ, COOPER, KOLB & GAYNOR

CHARTERED
33 NORTH LA SALLE STREET
CHICAGO, ILLINOIS 60602

April 11, 1985

BY MESSENGER

The Honorable John D. Schwartz
Bankruptcy Judge
Attn: Karen Jackson
Room 1690
219 S. Dearborn
Chicago, Illinois 60604

Re: Key West Restaurant & Lounge, Inc.—Case No. 84 B 04838;

Key West Restaurant & Lounge, Inc. v. Connecticut Indemnity Company, et al—Case No. 84 A 0728

Dear Judge Schwartz:

Pursuant to Karen Jackson's request, the Edgewood Bank submits the following information:

1. As of May 17, 1984, Harry Bockos, William Bockos and Nick Bahramis owed the Edgewood Bank the principal amount of $150,000 plus accrued interest of $2,991.78. This sum was evidenced by various promissory notes signed by these individuals as set forth in the Bank's claim filed October 25, 1984.

2. On December 20, 1984, all accrued interest was paid. In addition, a reduction of $50,000 in principal was made.

3. As of April 9, 1985, the principal sum due and owing Edgewood Bank from the above-noted individuals is $100,000 with accrued interest of $538.89. Interest continues to accrue at the per diem rate of $26.94. Interest has been paid quarterly by the above-noted individuals.

4. In addition to the Bank's claim of lien by virtue of the debtor's assignment of the proceeds of Connecticut Indemnity Company Insurance Policy No. SMP 85 1983, the Bank also has obtained a certificate of deposit pledged by the aforementioned individuals in the amount of $100,000.

Very truly yours,
/s/ Robert P. Handler
Robert P. Handler

RPH:slm
cc: All Counsel of Record